Edward J. Green (IL BAR NO. 6225069) (*PRO HAC VICE*)
Geoffrey S. Goodman (IL BAR NO. 6272297) (*PRO HAC VICE*)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60654-5313
Telephone:  312.832.4500
Facsimile:  312.832.4700
Email:  egreen@foley.com
Email:  ggoodman@foley.com

David Gould (CA Bar No. 37947)
DAVID GOULD, A PROFESSIONAL CORPORATION
23975 Park Sorrento, Suite 200
Calabasas, CA 91302-4001
Telephone: 818.222.8092
Facsimile: 818.449.4803
Email:  dgould@davidgouldlaw.com

Attorneys for Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

IN RE:

PACIFICA OF THE VALLEY CORPORATION,[1]

    DEBTOR.

CASE NO.  1:09-bk-11678-MT

CHAPTER 11

DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The Debtor in this proceeding is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley (Tax ID No. 33-0737312), with a mailing address of 9449 San Fernando Rd., CA 91352-1421.

## **DISCLAIMER**

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR PACIFICA OF THE VALLEY CORPORATION (THE "DEBTOR"), DATED NOVEMBER 16, 2010 (AS MAY BE FURTHER AMENDED, THE "PLAN") PROPOSED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR SUCH STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID AND TO SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS EXHIBIT A). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 4:00 P.M. (PACIFIC TIME) ON DECEMBER 8, 2010 (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY THE DEBTOR ON OR BEFORE THE VOTING DEADLINE. PLEASE SEE SECTION I.B OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS. BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS

DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.   PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.   THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR ACCEPTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

# I.    INTRODUCTION

## A.    General

On February 17, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision of the Bankruptcy Court.

The Debtor submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as Exhibit A. This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition and post-petition operations and finances and the Debtor's need to seek chapter 11 protection. This Disclosure Statement also describes the terms and conditions of the Plan, the Debtor's projections after the Effective Date of the Plan, potential alternatives to the Plan, certain effects of confirmation of the Plan and a description of the distributions proposed to be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that the holders of Claims and Equity Interests entitled to vote must follow for their votes to be counted.

CAPITALIZED TERMS USED AND NOT DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN UNLESS THE CONTEXT REQUIRES OTHERWISE.

## B.    Brief Summary of Plan

The Plan provides for a reorganization of the Debtor's estate and the continued operation of the Debtor's Hospital in Sun Valley, CA. Under the Plan, the Debtor intends to obtain a term loan (the "Sun Term Loan") from Sun Capital Healthcare, Inc. ("Sun"), the entity that provided a pre-petition and post-petition factoring facility for the Debtor's accounts receivable, in the amount of $2.5 million to fund the Debtor's operation of its Hospital after the Effective Date.

Sun will also receive (a) cash on the Effective Date on account of the Sun AR Tranche (approximately $4.75 million), and (b) the Sun Promissory Note, in the amount of $17,860,000, on account of the Sun DSH Tranche. The Sun Promissory Note matures on the date that is seven years after the Effective Date.

Health Care REIT, Inc. ("HCREIT"), the current holder of a senior deed of trust on the Debtor's real estate, improves, fixtures and equipment, will receive the HCREIT Promissory Note on account of its claims against the Debtor, as well as the approximately $3.8 million HCREIT Cash Payment on the Effective Date ($2,644,000 of which will be applied to the principal amount of the HCREIT Promissory Note). The Debtor will pay off the HCREIT Promissory Note over a thirty-six (36) month period following the Effective Date.

Holders of General Unsecured Claims will receive a Pro Rata Interest in the General Unsecured Promissory Note on account of their claims. The General Unsecured Promissory Note will have a principal amount equal to $4,575,000. The General Unsecured Promissory Note also matures on the date that is seven years after the Effective Date. At the time of any payment by the Reorganized Debtor on account of the Sun Promissory Note, the Reorganized Debtor shall pay an amount equal to twenty-five percent (25%) of such payment on account of the General Unsecured Promissory Note.

Holders of Subordinated Claims in Class 7 and holders of Equity Interests in Class 8 will receive no distributions under the Plan and their votes are not being solicited.

On the Effective Date and simultaneously with the vesting of the Debtor's assets in the Reorganized Debtor, the Reorganized Debtor shall enter into the Recapitalization Agreement, which shall be approved pursuant to the Confirmation Order. The Recapitalization Agreement is the document pursuant to which the Reorganized Debtor will issue 100% of the New Stock in the Reorganized Debtor to Paul R. Tuft on the Effective Date and simultaneously with the vesting of assets in the Reorganized Debtor. Accordingly, Paul R. Tuft will hold and own all of the New Stock in the Reorganized Debtor as of the Effective Date.

### C.    Voting Instructions and Procedures

#### 1.    Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Equity Interests that are Impaired under the Plan, each holder of an Allowed Claim or Equity Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan).

Under the Plan, all holders of Claims against the Debtor in Classes 2, 3, 4, 5 and 6 (the "Voting Classes") are Impaired and entitled to vote on the Plan. Holders of Claims in Class 1 are Unimpaired under the Plan and are deemed to have accepted the Plan. In addition, holders of Claims in Class 7 and Equity Interests in Class 8 are not receiving or retaining any property under the Plan on account of such Claims or Equity Interests and, therefore, are conclusively deemed to have rejected the Plan. Accordingly, holders of Claims in Classes 1 and 7 and Equity Interests in Class 8 are not entitled to vote on the Plan.

Only persons who hold Claims or Equity Interests on the Record Date (as defined below) are entitled to receive a copy of this Disclosure Statement. Only persons who hold Claims in the Voting Classes on the Record Date are entitled to vote on whether to accept or reject the Plan.

Separate pre-addressed return envelopes have been supplied for the Ballots. Holders of Allowed Claims in the Voting Classes should take care to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT. In order for a Ballot to be counted, it

must be completed, signed and sent to the Debtor **so as to be received by the Voting Deadline (4:00 p.m. Pacific Time on December 8, 2010)** at the following address:

Foley & Lardner LLP
111 North Orange Avenue
Suite 1800
Orlando, FL 32801-2386
Telephone:  (407) 423-7656
Attn:  Katherine E. Hall

If you are a holder of a Claim in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

Katherine E. Hall
Foley & Lardner LLP
111 North Orange Avenue
Suite 1800
Orlando, FL 32801-2386
Telephone:  (407) 423-7656

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY THE DEBTOR PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL BE COUNTED.   The Debtor will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed and satisfied.  See Section VI.D.4, "Cram Down."

### 2.        Voting Record Date

The record date for voting on the Plan is the close of business (Pacific time) on November 15, 2010 (the "Record Date").  Only holders of Claims in the Voting Classes as of the Record Date are entitled to vote to accept or reject the Plan.

### 3.        Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

### 4.    Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, the Debtor may reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise. The Debtor reserves the right to reject any and all Ballots not in proper form. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failing to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 5.    Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline except as may be otherwise ordered by the Bankruptcy Court. Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Debtor so as to be received by Katherine E. Hall at the address specified above before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the Claim to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by the Debtor, attn: Katherine E. Hall, by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the foregoing procedure. Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may change its vote by delivering to the Debtor a properly completed substitute Ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed Ballot for the same Claim(s) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted. After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

### D.    Confirmation Hearing

**The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at 1:00 p.m. Pacific time on December 15, 2010, before the Honorable Maureen A. Tighe, United States Bankruptcy Judge for the Central District of California, San Fernando Valley Division, 21041 Burbank Blvd., Courtroom 302, Woodland Hills, CA 91367.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

### E.    Recommendation and Support

The Debtor recommends that creditors entitled to vote on the Plan vote to **ACCEPT** the Plan. HCREIT, Sun and the Committee each supports confirmation of the Plan and recommends that creditors entitled to vote on the Plan vote to **ACCEPT** the Plan. The Committee has prepared a letter, attached hereto as <u>Exhibit B</u>, recommending that holders of General Unsecured Claims vote to **ACCEPT** the Plan.

## II.    CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILINGS

### A.    Business and Corporate History of the Hospital and the Debtor

The Debtor, which operates under the trade name Pacifica Hospital of the Valley, is a 231-bed acute-care hospital located in Sun Valley, CA (the "Hospital"). The Hospital has been a major provider of healthcare services to adults and children in the San Fernando Valley for over three decades.

The Hospital offers comprehensive inpatient and outpatient services to its patients including, among other things, 24-hour emergency care, coronary care, behavioral health services and nuclear medicine. In addition, the Hospital is known for its strong emphasis on pediatrics, obstetrics and maternity. The Hospital has maintained an average daily census of 146 patients for the past six months.

The Hospital is a Disproportionate Share Hospital. Fewer than ten percent (10%) of the Hospital's patients have private insurance. More specifically, the Hospital's payor mix is approximately as follows: 60% Medi-Cal, 20% Medicare, 10% unfunded, and 10% PPO/HMO.

8

### B.    Significant Debt Obligations

#### 1.    Obligations to Sun

As of the Petition Date, the Debtor was indebted to Sun in the aggregate sum of approximately $23,077,898.30, plus attorneys' fees and costs, under that certain Master Purchase and Sale Agreement dated as of March 6, 2008 (the "Factoring Agreement").  Under the Factoring Agreement, Sun purchased accounts receivable of the Debtor, including Disproportionate Share Hospital payments (together, the "Accounts").  The Debtor's sales of Accounts to Sun took place on a periodic basis as requested by the Debtor.

Prior to the Petition Date, the Debtor sold both "Governmental Accounts" (e.g., Medicare and Medi-Cal receivables) and "Non-Governmental Accounts" (e.g., receivables owed by commercial insurance companies) to Sun.  The purchase price for each Account (the "Purchase Price") varied.  When the Debtor offered Accounts for sale, Sun, in consultation with the Debtor, determined the "Net Collectible Amount" (or "NCA") on each Account, which was the amount the parties expected to collect on that Account based on collection experience and other relevant factors.  When the parties reached agreement on the NCA and the Purchase Price, Sun advanced the Debtor up to 85% of the NCA (the "Initial Down Payment"), with the balance of the Purchase Price, if any, due and payable after collection of the Account and charging of the "discount fee" described below.

Sun charged the Debtor a "discount fee" on the Purchase Price, which was a percentage of the NCA and was calculated based on the number of days elapsed between the closing date on the sale of an Account and the date when Sun received collections equal to the Initial Down Payment.  Under the Factoring Agreement, Sun took the credit risk of an obligor not paying on an Account; however, the Debtor had an obligation to repurchase from Sun Accounts for which Sun was not paid by an obligor within 150 days for reasons other than the bankruptcy, insolvency or similar credit issues of the obligor.

The Debtor's pre-petition obligations to Sun under the Factoring Agreement were secured by first priority liens in the following assets more fully described in the Factoring Agreement: all accounts and rights to payment, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof, including cash.

As described more fully below, Sun financed the Debtor's operations under a post-petition factoring facility approved by the Bankruptcy Court from the Petition Date (February 17, 2009) to January 2010.  The post-petition factoring facility was thereafter converted to a facility that permitted the Debtor to use Sun's cash collateral on an ongoing basis.  As of September 30, 2010, Sun held secured claims against the Debtor in the approximate amounts of (a) $4.7 million related to Sun's purchases of and advances against the Debtor's regular accounts receivable, and (b) $18.3 million related to Sun's purchases of and advances against Disproportionate Share Hospital Payments.

### 2.    Obligations to HCREIT

On April 5, 2004, the Debtor entered into that certain Loan Agreement with HCREIT, under which HCREIT loaned $18,800,000 to the Debtor, secured by a first-priority deed of trust on the Debtor's real property where the Hospital is located and a first-priority lien on certain equipment owned by the Debtor. As of the Petition Date, the Debtor was indebted to HCREIT in the amount of approximately $6.37 million.

As of September 30, 2010, HCREIT held claims against the Debtor in the amount of approximately $8.9 million, inclusive of unpaid attorneys' fees and adequate protection payments.

### C.    Events Leading to Chapter 11 Filing

The Debtor's story is no different than the story of many acute care hospitals across the State of California and the country. The Debtor had been experiencing increasing expenses and decreasing revenues for 18 to 24 months preceding the Petition Date. The budgetary and economic issues facing the State of California only worsened an already precarious financial situation at the Hospital.

For example, on July 1, 2008, the State of California cut the reimbursement rates for subacute care for Medi-Cal patients by 10%. That had an immediate negative cash impact on the Hospital of more than $130,000 per month.

In addition, in June of 2007, the Hospital entered into new collective bargaining agreements (the "Old CBAs") with SEIU United Healthcare Workers West ("SEIU-UHW") and Service Employees International Union Local 121 RN ("SEIU-121 RN," collectively with SEIU-UHW, the "Unions"). These two CBAs covered a substantial majority of the Hospital employees. The signing of the Old CBAs had an immediate negative impact on the Hospital of more than $460,000 per month.

As set forth in more detail below, the Debtor engaged in good faith, arms' length negotiations with the Unions in chapter 11 regarding the terms of modified CBAs that have substantially improved the Debtor's financial condition.

### III.    EVENTS DURING THE CHAPTER 11 CASES

On February 17, 2009 (the "Petition Date"), the Debtor commenced the Chapter 11 Case in the Bankruptcy Court. The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The following is a brief description of some of the major events during the Chapter 11 Case:

**A.    The Factoring Facility and Use of Cash Collateral**

In order to continue operating during the Chapter 11 Case, the Debtor determined that it needed to enter into a post-petition factoring facility under which it would continue to sell its Accounts to Sun.  On the Petition Date, the Debtor filed a motion (the "Factoring Motion") to approve a post-petition factoring facility with Sun and use Sun's cash collateral pursuant to §§ 361-364 and 507(b) of the Bankruptcy Code (the "DIP Factoring Facility").  On February 19, 2009, the Bankruptcy Court entered an interim order approving the Factoring Motion.  On March 26, 2009, the Bankruptcy Court entered a final order approving the Factoring Motion (the "Final Factoring Order").

The Final Factoring Order provided, among other things, that the sale to Sun of the Debtor's accounts receivable and rights to payment under the DIP Factoring Facility was a "true sale" free and clear of all liens, claims, encumbrances and interests other than the liens and security interests of Sun.  The Final Factoring Order further granted Sun first-priority liens to secure the Debtor's obligations to Sun under the DIP Factoring Facility on all of the following assets of the Debtor:  (a) all accounts receivable (whether offered for purchase or not), chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, inventory and equipment arising or existing as of or after the Petition Date, and all of the cash and non-cash proceeds, products and offspring of the foregoing; and (b) the Debtor's real property (land, improvements, fixtures, rents and leases) and claims and insurance proceeds with respect thereto, subject only to the prior liens of HCREIT on the real property, the prior liens of HCREIT and others on certain equipment, and certain carve-out expenses set forth in the Final Factoring Order (the "DIP Collateral").  In addition, as adequate protection of Sun's interests in pre-petition collateral, Sun was granted replacement liens in the DIP Collateral to the extent of any diminution in value resulting from (i) the Debtor's cessation of business operations, or (ii) the Debtor's use of Sun's pre-petition collateral. All post-petition obligations to Sun under the DIP Factoring Facility were also accorded superpriority administrative expense treatment.

From the Petition Date through January 2010, Sun financed the Debtor's operations through the purchase of accounts receivable and rights to payment of the Debtor pursuant to the Final Factoring Order.  In January 2010, Sun advised the Debtor that, for reasons unrelated to the Debtor, Sun was unable to continue to provide financing to the Debtor under the DIP Factoring Facility.  In order to keep the Hospital open, the Debtor requested, and Sun agreed, to permit the Debtor to use Sun's cash collateral in order to meet the Debtor's obligations in chapter 11, including payroll and critical supplies for the Hospital.

On January 22, 2010, the Debtor filed a motion to use Sun's cash collateral pursuant to an amendment to the Final Factoring Order (the "Cash Collateral Motion").  In the Cash Collateral Motion, the Debtor sought (a) immediate access to all cash proceeds of the Debtor's accounts receivable and rights to payment (whether or not purchased by Sun) that were collected in the lockbox accounts established under the DIP Factoring Facility, and (b) a finding that Sun would no longer purchase, or be deemed to have purchased, any accounts receivable or rights to payment of the Debtor after the accounts receivable offered to Sun during the week of January 11, 2010.  In other words, the DIP Factoring Facility would be transformed into a cash collateral facility.

11

After further negotiations between the Debtor and Sun, on January 25, 2010, the Bankruptcy Court entered an interim order approving the Cash Collateral Motion. On February 18, 2010, the Bankruptcy Court entered a final order approving the Cash Collateral Motion (the "Final Cash Collateral Order"). Pursuant to the Final Cash Collateral Order, as adequate protection of Sun's security interest in the cash collateral, Sun was granted, in additional to all of the liens granted or recognized in the Final Factoring Order, replacement liens in the DIP Collateral to the extent of the cash collateral remitted to the Debtor pursuant to the Final Cash Collateral Order.

The Debtor continues to operate its Hospital by using Sun's cash collateral pursuant to the terms of the Final Cash Collateral Order.

### B.    First-Day Orders

Shortly after the Petition Date, in addition to the Final Factoring Order, the Debtor obtained a number of standard chapter 11 "first-day" orders, thereby obtaining authority from the Bankruptcy Court to take a broad range of actions, including the payment of certain pre-petition Claims and to promote a "business as usual" atmosphere with its patients, vendors and employees. Specifically, the Debtor obtained authority to, among other things: (a) pay employees in the normal course and to continue all employee health and welfare benefit plans; (b) take measures to assure the continued availability of gas, water, electric, telephone and other utility services; and (c) maintain the Debtor's cash management systems and the use of pre-petition bank accounts, checks and other business forms.

### C.    Appointment of the Committee

On February 27, 2009, the Office of the United States Trustee appointed the Committee. The current membership of the Committee and its professional advisors are as follows:

#### Committee Members

Walden Medical Group
2515 North Vermont Avenue
Los Angeles, CA 90027
Attn: Anthony Francis

Special Respiratory Care, Inc.
18327 Napa Street
Northridge, CA 91325
Attn: Donald G. Reiter

Serra Community Medical Clinic, Inc.
9375 San Fernando Road
Sun Valley, CA 91352
Attn: Arlene A. O'Neil

Bruce W. Kovacs, MD
P.O. Box 3389
Seal Beach, CA 90740

Medline Industries
1 Medline Place
Mundelein, IL 60060
Attn: Hank Haegerich (Chairman)

12

**Committee Professionals**

| Counsel | Forensic Accountants |
|---|---|
| Samuel Maizel, Esq. | David K. Gottlieb |
| Malhar S. Pagay, Esq. | Alan L. Kahn |
| Pachulski Stang Ziehl & Jones LLP | Crowe Horwath LLP |
| 10100 Santa Monica Blvd. | 15233 Ventura Blvd. |
| 11th Floor | 9th Floor |
| Los Angeles, CA 90067-4100 | Sherman Oaks, CA 91403 |

### D.      Claims Process and Bar Dates

On March 17, 2009, the Debtor filed its Schedules, identifying the assets and liabilities of its Estate. In addition, pursuant to an order entered on September 9, 2009, the Bankruptcy Court established October 30, 2009 as the Bar Date for the filing of Proofs of Claim against the Debtor's estate, including any claims by governmental units.

The Debtor has started the process of filing objections to the claims asserted against its Estate. To date, the Debtor has filed three omnibus claim objections and three individual claim objections and has expunged 38 claims with an asserted value of over $2.3 million, and has also reclassified numerous alleged priority and secured claims as General Unsecured Claims. The Debtor anticipates continuing to work on the claim objection process prior to and after the Effective Date.

### E.      The Debtor's Agreements with its Unions

In late May of 2010, the Debtor came to terms with the Unions on new collective bargaining agreements (the "New CBAs"). The New CBAs became effective on June 1, 2010 and expire on June 1, 2013. The New CBAs amended and replaced the Old CBAs that expired on June 1, 2010. The New CBAs are binding on the Debtor and are binding upon any person, party, partnership, or corporation that may subsequently acquire or otherwise assume control of the Debtor or management of the Debtor.

On or about February 17, 2009, the Debtor filed that certain Motion for Order pursuant to Sections 507(a), 363(b), and 105(a) of the Bankruptcy Code Authorizing (i) Payment of Wages, Compensation, and Employee Benefits and (ii) Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Wages Motion"). In the Wages Motion, the Debtor sought permission to honor, in its sole discretion and in the ordinary course, pre-petition paid time off, vacation days, sick days, holiday days, bereavement days, and jury duty days (collectively, the "Pre-Petition PTO") that had been accrued prior to the Petition Date by its union employees under the Old CBAs and its non-union employees (collectively, the "Employees") under the Debtor's policies and procedures. On February 19, 2010, the Bankruptcy Court entered an order granting the Wages Motion (the "Wages Order").

Pursuant to the Wages Order, between the Petition Date and the date of this Disclosure Statement, the Debtor has continued to honor the Pre-Petition PTO that had accrued prior to the Petition Date in the ordinary course of business. On the Petition Date, the Pre-Petition PTO had a book value of 2,957,342.34. As of September 3, 2010, the Pre-Petition PTO had a book value of $584,209.82. To the extent any Pre-Petition PTO remains unused thirty days after the Effective Date of the Plan, the Debtor will, beginning with anniversary dates that occur 30 days after the Effective Date of the Plan, allow its Employees to cash out any unused Pre-Petition PTO on their anniversary dates as set forth in the Old CBAs, New CBAs and the Debtor's policies and procedures.

Since the Petition Date, the Employees have also accrued paid time off, vacation days, sick days, holiday days, bereavement days, and jury duty days (the "Post-Petition PTO"). As of September 3, 2010, the Post-Petition PTO had a book value of $3,414,407.11. To the extent any Post-Petition PTO remains unused thirty days after the Effective Date of the Plan, the Debtor will, beginning with anniversary dates that occur 30 days after the Effective Date of the Plan, allow its Employees to cash out any unused Post-Petition PTO on their anniversary dates as set forth in the Old CBAs, New CBAs and the Debtor's policies and procedures.

Any limitations or caps set forth in the Old CBAs, New CBAs and the Debtor's policies and procedures related to the amount of Pre-Petition PTO or Post-Petition PTO that can be accrued in any given year are hereby waived until the Employees reach their anniversary date and have a right to cash out any accrued Pre-Petition PTO and Post-Petition PTO.

In exchange for this treatment, pursuant to the Plan, the Employees will not file, and shall be deemed to have waived, the right to file, any Priority Claims, General Unsecured Claims, Administrative Expense Claims, or any other Claims related to the Pre-Petition PTO and Post-Petition PTO.

In addition, the Unions shall not possess or assert any Administrative Expense Claims against the Estate, as any such Claims are fully and completely satisfied by the Debtor's performance under the New CBAs.

## IV.    SUMMARY OF THE PLAN

### A.    Introduction

Set forth in this Article is a description of the basic terms of the Plan. This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as Exhibit A.

### B.    Classification of Claims

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its

claim.  The Debtor believes that the Plan complies with this standard.  The Plan divides Claims against and Equity Interests in the Debtor into the following Classes:

**Class 1 (Priority Claims)** shall consist of all Priority Claims.

**Class 2 (HCREIT Claims)** shall consist of all HCREIT Claims.

**Class 3 (Sun Claims)** shall consist of all Sun Claims.

**Class 4 (Secured Tax Claims)** shall consist of all Secured Tax Claims.

**Class 5 (Other Secured Claims)** shall consist of all Other Secured Claims.

**Class 6 (General Unsecured Claims)** shall consist of all Unsecured Claims and the unsecured portion of any Claim that if fully secured would have been included in Class 5 and as to which the Debtor shall have elected Option A or Option C treatment under Section 5.5 of the Plan.

**Class 7 (Subordinated Claims)** shall consist of all Subordinated Claims.

**Class 8 (Equity Interests)** shall consist of all Equity Interests.

For a description of the treatment of the Claims and Equity Interests and a summary of distributions under the Plan, see Section IV.C, "Treatment of Claims and Equity Interests and Summary of Distributions under the Plan."

A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is a Claim or Equity Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

C.    **Treatment of Claims and Equity Interests and Summary of Distributions under the Plan**

The Confirmation Order shall provide for the vesting of the Debtor's assets in the Reorganized Debtor.  Pursuant to the terms of the Plan, the Reorganized Debtor, either itself or through a Disbursing Agent, will, among other things, calculate and pay all distributions required or permitted under the Plan.

1.      **Administrative Claims**

a.      **Allowed Administrative Expense Claims**

Subject to the provisions contained in Section 2.2 of the Plan, unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Administrative Expense Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) for Ordinary Course Administrative Expense Claims, when such Claims are due and payable in the ordinary course of the Debtor's business, (c) 30 days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and (d) the date the Reorganized Debtor is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto.

b.      **Requests for Allowance of Administrative Expense Claims**

Except as expressly set forth to the contrary in the Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following Subsections:

(1)      **Professionals**.    All Professionals shall file a final application for the allowance of a Fee Claim on or before forty (40) days following the Effective Date.  Objections to any Fee Claim must be filed and served on the Reorganized Debtor, former counsel for the Committee and the requesting Professional no later than twenty (20) days after the filing of the applicable application for allowance of the Fee Claim.  Pursuant to its agreement with the Committee, Sun is hereby waiving the following clause from Section 5.1, lines 6-9 of the Factoring Order:  "provided, however, that no more than $10,000 in the aggregate may be used by the Committee to investigate the validity, priority and amount of the Pre-Petition Obligations, the Pre-Petition Liens and the Pre-Petition Ownership Interests."

(2)      **Other Administrative Expense Claimants**.  All holders of Administrative Expense Claims other than Professionals shall file a request for payment of an Administrative Expense Claim with the Bankruptcy Court on or before forty (40) days following the Effective Date.  Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request for payment by such deadline shall be forever barred from asserting such Claims against the Debtor, the Reorganized Debtor or their respective property and assets (whether cash or otherwise).

2.      **Priority Tax Claims**

a.      **Schedule of Payments**

Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Priority Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall be paid a value, as of the Effective Date, equal to the unpaid portion of

such Allowed Priority Tax Claim in quarterly cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.

**b.    Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding the provisions of Section 2.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code.  Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to treatment in Class 7 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

**c.    Estimated Amount of Allowed Priority Tax Claims**

Certain governmental entities, including the City of Los Angeles, Office of Finance ("LA City"), and the LA County Treasurer and Tax Collector ("LA County"), have filed Priority Tax Claims against the Estate.  While the asserted amount of such Priority Tax Claims is approximately $2.1 million, the Debtor believes that the aggregate Allowed amount of Priority Tax Claims will be closer to $1.6 million (or less) due to, among other things, (a) the inclusion of unrecoverable post-petition penalties on account of pre-petition claims in the Claims of both LA County and LA City, and (b) the inclusion of amounts that are not recoverable as a Priority Tax Claim under § 507(a)(8)(B) of the Bankruptcy Code in the Claim of LA County.

In addition to its Priority Tax Claim, LA County has filed a Secured Tax Claim against the Estate in the amount of $1,136,283.98.  While the Debtor disputes the amount of LA County's Secured Tax Claim, it is included in Class 4 and summarized in Section IV.C.3 below.

See Section VII.D below, "Risk Factors to be Considered:  Priority and Secured Tax Claim Risks," for more information on the Claims asserted by LA County and LA City.

**3.    Summary of Classification and Treatment of Holders of Allowed Claims and Equity Interests that are Placed in Classes**

The following table sets forth a brief summary of the classification and treatment of Claims and Equity Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan.  The information set forth in the tables is for convenience of reference only.  Each holder of a Claim or Equity Interest should refer to Article V of the Plan, "Treatment of Classes of Claims and Equity Interests," for a full understanding of the classification and treatment of Claims and Equity Interests provided under the Plan.  The estimates set forth in the table may differ from actual distributions due to, among other things, variations in the amount of Allowed Claims, the existence and resolution of Disputed Claims and certain risk factors potentially impacting recoveries under the Plan, including those described in Section VII below.  Unless otherwise noted, these estimates are as of September 30, 2010.

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 1 (Priority Claims):** Consists of all Priority Claims.<br><br>Estimated Aggregate Claims Amount: $25,000 | Unimpaired; unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Priority Claim, the Disbursing Agent shall pay to each holder of an Allowed Priority Claim an amount equal to its Allowed Priority Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Priority Claim becomes an Allowed Priority Claim by the entry of a Final Order, and (c) the date the Reorganized Debtor is otherwise obligated to pay such Allowed Priority Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2 (HCREIT Claims):** Consists of all HCREIT Claims.<br><br>Estimated Aggregate Claims Amount: $9,200,804.17 | Impaired;<br><br>**HCREIT Promissory Note.** The HCREIT Claims shall be Allowed Claims and such claims shall be satisfied by (a) the Reorganized Debtor's execution and delivery of the HCREIT Promissory Note on the Effective Date, and (b) the HCREIT Cash Payment. The HCREIT Promissory Note may be prepaid in whole or in part at any time without penalty. The HCREIT Promissory Note shall be secured by (i) a first-priority Lien on the Real Estate Collateral, and (ii) a second-priority Lien on the Remaining Assets, immediately junior to the Liens securing the Sun Term Loan and the Sun Promissory Note. Any amounts payable under the HCREIT Promissory Note after the HCREIT Regular Payment Completion Date shall continue to be secured by the foregoing Liens, but HCREIT shall not be entitled to foreclose, or execute upon, or otherwise exercise any other rights or remedies to enforce its right to payment of such amounts until payment in full of the Sun Term Loan, the Sun Promissory Note and the General Unsecured Promissory Note.<br><br>**Right of Purchase by Sun.** Sun or its designee shall have the right at any time to purchase the HCREIT Promissory Note, and receive an assignment by HCREIT of the HCREIT Promissory Note and the Liens securing the HCREIT Promissory Note, without representation or warranty other than that HCREIT is conveying to Sun or its designee all of |

| | |
|---|---|
| | HCREIT's right, title and interest in and to the HCREIT Promissory Note and the Liens securing the HCREIT Promissory Note, free and clear of any liens, claims or encumbrances created by or through HCREIT, upon payment to HCREIT in Cash of an amount equal to the then-unpaid balance of the HCREIT Promissory Note, which amount shall include all unpaid principal, interest, costs, fees (including legal fees) and other charges then outstanding under the HCREIT Promissory Note, with such terms of Sun's right to purchase the HCREIT Promissory Note to be included in the Intercreditor Agreement; provided, however, that the Intercreditor Agreement will not impose any material conditions on Sun's right to buy the HCREIT Promissory Note in addition to those set forth in the Plan.<br><br>Estimated Percentage Recovery:  100% |
| **Class 3 (Sun Claims)**:  Consists of all Sun Claims.<br><br>Estimated Aggregate Claims Amount:  $23,500,000 | Impaired; the Sun Claims shall be Allowed Claims and such Claims shall be satisfied as follows:<br><br>**Sun AR Tranche.**   On the Effective Date, the Sun AR Tranche shall be paid in full as follows:  (i) first, Sun shall apply all of the Debtor's cash collateral held by Sun on the Effective Date; and (ii) second, the Reorganized Debtor shall pay the balance of the Sun AR Tranche to Sun in Cash.<br><br>**Sun DSH Tranche.**  On the Effective Date, the Reorganized Debtor shall execute and deliver the Sun Promissory Note. Sun shall not charge or collect any prepayment penalty on account of the Debtor's whole or partial prepayment of the Sun Promissory Note.   The Sun Promissory Note shall be secured by the following Liens and pledge, which Liens and pledge shall be pari passu with the Liens and pledge securing the Sun Term Loan:  (i) a first-priority Lien on the Remaining Assets, (ii) a second-priority Lien on the Real Estate Collateral, immediately junior to the Lien securing the HCREIT Promissory Note, (iii) a first-priority Lien on the Assigned Causes of Action, which Lien shall be the sole and exclusive lien, charge or encumbrance on the Assigned Causes of Action, and (iv) a pledge of the New Stock, which pledge shall be the sole and exclusive lien, charge or encumbrance on the New Stock; provided, however, that Sun may not foreclose, or execute upon, or otherwise exercise any other rights or remedies with respect to the New Stock, until (x) the Reorganized Debtor has fully paid HCREIT the HCREIT Fee Satisfaction and all amounts due under the HCREIT Promissory Note, or (y) Sun or its designee has |

purchased the HCREIT Promissory Note in accordance with the provisions of Section 5.2 of the Plan.

**Assigned Causes of Action**.  (i) On the Effective Date, all of the Debtor's right, title and interest in and to the Assigned Causes of Action shall be transferred, assigned, conveyed and delivered to Sun or its designee and shall vest in Sun or its designee free and clear of all Claims, Liens, charges, other encumbrances; <u>provided</u>, <u>however</u>, that if Sun does not commence a proceeding in the Bankruptcy Court on or before February 11, 2011 with respect to any Assigned Cause of Action that is an Avoidance Action, such Avoidance Action shall automatically revert to the Reorganized Debtor and may be prosecuted by the Reorganized Debtor.  All Assigned Causes of Action that are Workers' Compensation Insurance Causes of Actions shall remain vested in Sun or its designee, and shall not revert to the Reorganized Debtor, regardless of whether any action or proceeding is commenced with respect thereto.

**(ii)**    Any Net Proceeds of Assigned Causes of Action, whether the Assigned Cause of Action is prosecuted by Sun or by the Reorganized Debtor, shall be turned over to Sun or its designee and applied to payment of the Sun Promissory Note first toward accrued and unpaid interest, and second toward principal payments owing in inverse order of maturity; <u>provided</u>, <u>however</u>, that any Net Proceeds of Assigned Causes of Action received by Sun or its designee after the Sun Promissory Note has been paid in full shall be turned over to the Class 6 Creditor Trust to apply to the unpaid amount of the General Unsecured Promissory Note, or if the General Unsecured Note has been paid in full, to the Reorganized Debtor.

**(iii)**    If there are any Net Proceeds of Assigned Causes of Action resulting from Workers' Compensation Insurance Causes of Action, the application of Net Proceeds of Assigned Causes of Action resulting from Workers' Compensation Insurance Causes of Action in reduction of the Sun Promissory Note may be reversed to the extent that such funds are required for payment of any retrospective premiums that become owing under the workers' compensation policies for the Debtor for calendar years 2006, 2007 or 2008; <u>provided</u>, <u>however</u>, that any such reversal of the application of such Net Proceeds of Assigned Causes of Action Workers' Compensation Insurance Causes of Action shall not exceed the amount of such Net Proceeds of Assigned Causes of Action Workers' Compensation Insurance Causes of Action

| | |
|---|---|
| | actually collected by Sun and applied by Sun to pay down the Sun Promissory Note. The Reorganized Debtor shall not be responsible for any such retrospective premium payment or repayment.<br><br>**Reconveyance of Accounts to Reorganized Debtor**. On the Effective Date, Sun shall reconvey to the Reorganized Debtor ownership of all accounts receivable of the Debtor purchased by Sun, without representation or warranty, other than that Sun is conveying to the Reorganized Debtor all of Sun's right, title and interest in and to such accounts receivable, free and clear of any liens, claims or encumbrances created by or through Sun.<br><br>Estimated Percentage Recovery: 98.04% |
| **Class 4 (Secured Tax Claims)** Consists of all Secured Tax Claims.<br><br>Estimated Aggregate Claims Amount: $800,000 to $860,000 | Impaired; pursuant to § 1129(a)(9)(D) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Secured Tax Claim and the Reorganized Debtor, each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim and shall be paid a value as of the Effective Date equal to the unpaid portion of such Allowed Secured Tax Claim in quarterly Cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.<br><br>Estimated Percentage Recovery: 100% |
| **Class 5 (Other Secured Claims)**: Consists of all Other Secured Claims.<br><br>Estimated Aggregate Claims Amount: $0 to $60,000 | Impaired; on the Effective Date, unless otherwise agreed in writing by a Claimant and the Debtor or the Reorganized Debtor, each holder of an Allowed Other Secured Claim will receive the treatment on account of such Allowed Claim in the manner set forth in Option A, B or C below, at the election of the Debtor. Each Other Secured Claim shall be deemed a separate subclass with respect to such Other Secured Claim. The Debtor will be deemed to have elected Option A except with respect to any Allowed Other Secured Claim as to which the Debtor elects Option B or Option C in one or more certifications filed prior to the Effective Date.<br><br>Option A: Allowed Other Secured Claims with respect to which the Debtor elects or is deemed to elect Option A will be paid a value, as of the Effective Date, equal to the amount of such Allowed Other Secured Claims quarterly cash payments for a period of seven years after the Effective Date. |

| | |
|---|---|
| | Option B:  Allowed Other Secured Claims with respect to which the Debtor elects Option B will be Reinstated.<br><br>Option C:  A holder of an Allowed Other Secured Claim with respect to which the Debtor elects Option C will be entitled to receive (and the Debtor shall release and transfer to such holder) the collateral securing such Allowed Other Secured Claim.<br><br>Estimated Percentage Recovery:  100% |
| **Class 6 (General Unsecured Claims)**: Consists of all General Unsecured Claims.<br><br>Estimated Aggregate Claims Amount: $10,600,000 | Impaired; Holders of Allowed General Unsecured Clams shall receive a Pro Rata interest in the General Unsecured Promissory Note issued by the Reorganized Debtor.  Neither the holders of Allowed General Unsecured Claims nor the Class 6 Creditor Trust shall charge or collect any prepayment penalty on account of the Debtor's whole or partial prepayment of the General Unsecured Promissory Note.  At the time of any payment by the Reorganized Debtor on account of the Sun Promissory Note, the Reorganized Debtor shall pay an amount equal to twenty-five percent (25%) of such payment on account of the General Unsecured Promissory Note.<br><br>Estimated Percentage Recovery: 43.16% |
| **Class 7 (Subordinated Claims)**:  Consists of all Subordinated Claims. | Impaired; holders of Allowed Subordinated Claims shall neither receive nor retain any property on account of their Claims.<br><br>Estimated Percentage Recovery:  0% |
| **Class 8 (Equity Interests)**: Consists of all Equity Interests. | Impaired; Equity Interests shall be cancelled, released and extinguished, and holders of Equity Interests shall neither receive nor retain any property on account of such Equity Interests. |

Under the Bankruptcy Code, only holders of Allowed Claims in Classes that are Impaired are entitled to vote to accept or reject the Plan.  The holders of Allowed Claims in Classes 2, 3, 4, 5 and 6 are Impaired and entitled to vote to accept or reject the Plan.

Holders of Class 1 Priority Claims are Unimpaired by the Plan.  Under § 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 are conclusively deemed to have accepted the Plan, and the votes of such holders will not be solicited.  Holders of Claims in Class 7

(Subordinated Claims) and Equity Interests (Class 8) are Impaired but are not entitled to receive or retain any property under the Plan.  Accordingly, holders of Claims in Class 7 and Equity Interests in Class 8 are deemed to have rejected the Plan and their votes will not be solicited.

### D.    Distribution Provisions

#### 1.    Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Disbursing Agent pursuant to the terms and conditions contained in the Plan; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under § 502(d) of the Bankruptcy Code.

#### 2.    Distributions of Cash

All distributions of Cash to be made by the Disbursing Agent pursuant to the Plan shall be made by a check or wire transfer from the Disbursing Agent's account maintained in accordance with the Plan.

#### 3.    Effective Date Payments

As soon as is practicable after the Effective Date, the Disbursing Agent shall make the initial distributions (the "Initial Distribution Date") to holders of Allowed Administrative Expense Claims and Allowed Priority Claims entitled to such distributions pursuant to the Plan. All payments shall be made in accordance with the terms and provisions of the Plan.

#### 4.    Distributions on a Subsequent Distribution Date

Pursuant to the terms of provisions of the Plan, the Disbursing Agent shall, on a subsequent date (a "Subsequent Distribution Date"), distribute such Cash or other assets to the holders of Claims entitled to distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in accordance with the treatment of Allowed Claims established by the Plan.

#### 5.    Distributions on the Final Distribution Date

Distributions to the holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing within six months of the distribution date of such holder's then current address, at which time all distributions shall be made to such holder, without interest.  All claims for undeliverable distributions shall be made within six months after the date such undeliverable distribution was initially made.  If any claim for an undeliverable distribution is not timely made as provided herein, such claim shall be forever barred with prejudice.  After such date, all unclaimed property shall be applied first to satisfy the costs of administering and fully consummating the Plan, then shall be transferred to the Reorganized

Debtor and available to be used for general corporate purposes, including working capital, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such undeliverable distribution or such Claim.

### 6.  Delivery of Distributions and Undeliverable Distributions

Distributions to the holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing within six months of the distribution date of such holder's then current address, at which time all distributions shall be made to such holder, without interest.  All claims for undeliverable distributions shall be made within six months after the date such undeliverable distribution was initially made.  If any claim for an undeliverable distribution is not timely made as provided herein, such claim shall be forever barred with prejudice.  After such date, all unclaimed property (a) shall be applied first to satisfy the costs of administering and fully consummating the Plan, then shall be transferred to the Reorganized Debtor and available to be used for general corporate purposes, including working capital, provided that unclaimed distributions on account of General Unsecured Claims shall be turned over to the Class 6 Creditor Trust for further Pro Rata distribution to the remaining holders of Allowed General Unsecured Claims, and (b) the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such undeliverable distribution or such Claim.

### 7.  Time Bar to Cash Payments and Disallowances

Checks issued by the Disbursing Agent in respect of Allowed Clams shall be void if not negotiated within six months after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of six months following the date of issuance of such check.  After such date, (a) all funds held on account of such void check shall be applied first to satisfy the costs of administering and fully consummating the Plan, then will be available to the Reorganized Debtor to be used for general corporate purposes, provided that uncashed distributions on account of General Unsecured Claims shall be turned over to the Class 6 Creditor Trust for further Pro Rata distribution to the remaining holders of Allowed General Unsecured Claims, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further distribution on account of such Claim.

### 8.  Minimum Distributions

If a distribution to be made to a holder of an Allowed Claim on any Distribution Date, including the Final Distribution Date, would be $10.00 or less, notwithstanding any contrary provision of the Plan, no distribution will be made to such Claimant.

### 9.    Transactions on Business Days

If the Effective Date or any other date on which a transaction, event or act may occur or arise under the Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by the Plan to occur on such day shall instead occur on the next day which is a Business Day.

### 10.    Dividends and Equity Distributions

The Reorganized Debtor shall not pay any dividends or make any distributions to its equity holders until the HCREIT Promissory Note, the Sun Promissory Note and the General Unsecured Promissory Note are paid in full.

### 11.    Distributions after Allowance

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

### 12.    Disputed Payments

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Disbursing Agent may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 13.    No Distributions in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

### E.    Means for Execution of the Plan

### 1.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor

As of the Effective Date, the Reorganized Debtor shall continue to exist as a corporate entity in accordance with applicable law pursuant to its Amended Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estate, including all claims, rights and Causes of Action, other than Assigned Causes of Action, shall vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Equity Interests.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of Property and compromise or settle any Claims without supervision of or approval of the Bankruptcy Court free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation

Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

### 2.    Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of the Debtor or the Reorganized Debtor.

### 3.    Certificate of Incorporation and Bylaws

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtor shall file with the Secretary of State of the State of Delaware, in accordance with §§ 103 and 303 of the Delaware General Corporation Law, the Amended Certificate of Incorporation and Bylaws. The Amended Certificate of Incorporation and Bylaws shall become the Amended Certificate of Incorporation and Bylaws of the Reorganized Debtor.  The Amended Certificate of Incorporation and Bylaws for the Reorganized Debtor shall, among other things, authorize 100 shares of New Stock, $0.0001 par value per share.  The Amended Certificate of Incorporation and Bylaws for the Reorganized Debtor will be included in the Plan Supplement.

### 4.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the property of the Estate vesting in the Reorganized Debtor or Sun will be fully released and discharged.  As of the Effective Date, the Reorganized Debtor shall be authorized to file or record on behalf of creditors or putative creditors such Uniform Commercial Code termination statements, real property releases or reconveyances, or other documents or instruments as may be necessary to implement the provisions of Section 6.4 of the Plan.

### 5.    Cancellation of Equity Interests and Authorization and Issuance of New Stock

**a.**    As set forth in Section 5.8 of the Plan, on the Effective Date, the Equity Interests shall be cancelled, released and extinguished, and holders of Equity Interests shall neither receive nor retain any property on account of such Equity Interests.

**b.**    On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New Stock to be distributed pursuant to the Plan without any further act or action by any other party under applicable law, regulation, order or rule.  The issuance of the New Stock and the distribution thereof under the Plan shall be exempt from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws.

All documents, agreements and instruments entered into, on or as of the Effective Date contemplated by or in furtherance of the Plan, including without limitation the Recapitalization Agreement and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

        **c.**    All of the shares of New Stock issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.  Until the Sun Promissory Note is paid in full, the Reorganized Debtor and Tuft shall not (a) issue any other shares of New Stock or any other shares of stock of the Reorganized Debtor unless such transferee is bound by the pledge of New Stock to Sun set forth in the Plan, (b) grant any warrants or other rights with respect to the New Stock or any other shares of stock of the Reorganized Debtor unless such transferee is bound by the pledge of New Stock to Sun set forth in the Plan, or (c) pledge or otherwise encumber the New Stock.  Any attempted transfer, grant of warrants or other rights, or pledge or other encumbrance of New Stock in violation of Section 6.5(c) of the Plan shall be null and void and of no force or effect.

**6.**      **The Recapitalization Agreement**

        **a.**    On the Effective Date and simultaneously with the vesting of the Debtor's assets in the Reorganized Debtor, the Reorganized Debtor shall enter into the Recapitalization Agreement with Tuft, which shall be approved pursuant to the Confirmation Order.

        **b.**    As of the Effective Date and in accordance with the terms of the Recapitalization Agreement, Tuft shall own 100% of the New Stock and shall have the authority to manage the Reorganized Debtor pursuant to the terms of the Plan and other applicable law.

**7.**      **The Sun Term Loan**

        **a.**    On the Effective Date, Sun and the Reorganized Debtor shall enter into the Sun Term Loan documents, and On the Effective Date, Sun and the Reorganized Debtor shall enter into the Sun Term Loan documents, and Sun shall advance the following amounts thereunder to the Reorganized Debtor:

        **(i)**    the sum of $2,264,150 (the "Long Term Portion"), of which $1,499,900 shall be advanced by means of a reduction of the Cash payment by the Reorganized Debtor to Sun with respect to the Sun AR Tranche, and $724,250 shall be advanced by Sun in Cash; and

        **(ii)**    the sum of $235,850 (the "Liquidity Portion"), all of which shall be advanced by Sun in Cash.

        **b.**    The Long Term Portion shall mature on the date that is fifty-four (54) months after the Effective Date.  The Long Term Portion shall (i) bear regular interest at 13% per annum, (ii) with default interest, payable only in the event of a payment default with respect to the Long Term Portion, at 17% per annum, (iii) only accrue interest during the first

thirty-six (36) months, and (iv) be fully amortized by equal monthly payments of principal and interest during months thirty-seven (37) through fifty-four (54).

   **c.** The Liquidity Portion shall be held in a separate interest-bearing depository account of the Reorganized Debtor, segregated from all other funds, subject to a deposit account control agreement in favor of Sun, which funds may be drawn upon by the Reorganized Debtor at any time in the event that the Reorganized Debtor has not received a Disproportionate Share Hospital Payment for at least 90 days, and if drawn, must be repaid to the depository account from the next succeeding Disproportionate Share Hospital Payment, together with regular interest on the drawn amount at the rate of 13% per annum, with default interest, payable only in the event of a payment default with respect to the Liquidity Portion, at the rate of 17% per annum. On the date that is thirty-six (36) months after the Effective Date, the entire amount of the Liquidity Portion, together with all interest earned on such funds or paid by the Reorganized Debtor with respect to such funds, shall be paid and turned over to Sun.

   **d.** The Sun Term Loan shall be secured by (i) a first-priority Lien on the Remaining Assets, (ii) a second-priority Lien on the Real Estate Collateral, immediately junior to the Lien securing the HCREIT Promissory Note, (iii) a first-priority Lien on the Assigned Causes of Action, and (iv) a pledge of the New Stock, with such pledge subject in all respects to the limitations on the exercise of Sun's rights with respect to such pledge set forth in Section 5.3(b) of the Plan, which Liens and pledge shall be pari passu with the Liens and pledge securing the Sun Promissory Note.

   **e.** The existing government and non-government lockboxes and lockbox bank accounts established by Sun in connection with its factoring facility for the Debtor shall remain in place after the Effective Date; provided, however, that absent an event of default under the Sun Term Loan, the funds received in such lockbox bank accounts shall not be commingled with any other funds held by Sun and shall be promptly remitted back to the Reorganized Debtor, as further described in the Intercreditor Agreement and any other relevant agreements, documents or letters.

   **f.** Sun shall not charge or collect any prepayment penalty with respect to the Sun Term Loan.

   **8.** **Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor**

   **a.** **Board of Directors.** As of the Effective Date, the Board of Directors shall be the governing body of the Reorganized Debtor for one year or such later time when a shareholders' meeting is scheduled pursuant to the Organizational Documents or applicable non-bankruptcy law, whichever is longer, and shall assume the governance of the Reorganized Debtor including, but not limited to, determining who shall serve as the Reorganized Debtor's Officers, supervisors, managers and executive employees.

   **b.** **Identity of Board of Directors.** On the Effective Date, the term of the current members of the board of directors of the Debtor, if any, will expire. The identity of the initial members of the Board of Directors shall be included in the Plan Supplement.

        **c.**     **Other Provisions.**  Other provisions governing the service, term and continuance in office of the members of the Board of Directors shall be as set forth in the Organizational Documents of the Reorganized Debtor.

### 9.  Disbursing Agent

On the Effective Date, the Reorganized Debtor shall have the authority to serve as, or appoint, the Disbursing Agent to carry out the duties set forth in the Plan.  The Reorganized Debtor shall have the authority to replace the Disbursing Agent at any time, with or without cause, subject to the terms of any agreement between the Reorganized Debtor and the Disbursing Agent.  The Reorganized Debtor shall file any agreement with the Disbursing Agent with the Bankruptcy Court and serve such agreement on the United States Trustee, HCREIT, Sun and the Class 6 Creditor Trustees.

### 10.  Closing of Case

If, after the Effective Date, the Chapter 11 Case is closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of the Plan, (b) shall not affect any rights of the Debtor, the holders of Claims or Equity Interests or the treatment of any other Person under the Plan, (c) shall continue to cause the terms of the Plan to remain binding on all Persons, (d) shall cause all orders of the Bankruptcy Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article XII of the Plan.

### 11.  Effectuating Documents; Further Transactions

The chief executive officer, the chief financial officer, chairman of the Debtor's board of directors or any other executive officer of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the Debtor shall be authorized to certify or attest to any of the foregoing actions.

### 12.  Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor, Sun or to any other Person pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 13.     Withholding and Reporting Requirements

In connection with the Plan, the Reorganized Debtor shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) continue to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to the Plan.

### 14.     Quarterly Reports and United States Trustee's Fees

The Debtor's obligation of filing monthly financial reports with the United States Trustee shall pass to and become the obligation of the Reorganized Debtor and such obligation shall continue following the Confirmation Date until the obligation to pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) ends, except such monthly reports will be filed quarterly.   The Officers shall prepare, sign, and file all reports after the Confirmation Date and shall pay any United States Trustee's fees due and owing.   Copies of such reports shall be served on the Board of Directors, the United States Trustee, counsel for the Reorganized Debtor, HCREIT and Sun, and on any party-in-interest requesting continued service of same.

### 15.     Preservation of Causes of Action

a.     **Vesting of Causes of Action.**   In accordance with § 1123(b) of the Bankruptcy Code, except (i) as otherwise provided in the Plan, and (ii) with respect to Assigned Causes of Action, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all claims and Causes of Action held by the Debtor and/or the Estate, whether arising before or after the Petition Date.   Except for the Assigned Causes of Action, all such claims and Causes of Action, along with all rights, interests and defenses related thereto, shall vest with the Reorganized Debtor.   The Assigned Causes of Action, along with all rights, interests and defenses related thereto, shall vest in Sun or its designee.

b.     **Reservation of Causes of Action.**   Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtor and the Reorganized Debtor specifically reserve all Causes of Action, other than the Assigned Causes of Action, for later adjudication, and Sun specifically reserves all Assigned Causes of Action for later adjudication.   Therefore, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the Causes of Action upon, after or as a consequence of the confirmation, the Effective Date or consummation of the Plan.   **A non-exclusive list of all Persons who may be subject to a Cause of Action and Assigned Causes of Action by the Debtor, the Reorganized Debtor or Sun, as the case may be, is attached hereto as <u>Exhibit C</u>.   The inclusion of a Person in, or the omission of a Person from, <u>Exhibit C</u> hereto does not mean that a decision has been made to assert, or not to assert, a Cause of Action against such Person.**

      **c.**      **Preservation of Defensive Use of Causes of Action.**  Whether or not any Cause of Action other than an Assigned Cause of Action is pursued or abandoned, the Debtor and the Reorganized Debtor reserve their rights to use any such Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.  Whether or not any Assigned Cause of Action is pursued or abandoned, Sun reserves its rights to use any such Assigned Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.

      **d.**      **Discretion to Pursue or Settle and Immunity of the Parties.**  The Reorganized Debtor shall have discretion to pursue or not to pursue, to settle or not to settle, to try or not to try, and/or to appeal or not to appeal all Causes of Action other than the Assigned Causes of Action, and Sun shall have discretion to pursue or not to pursue, to settle or not to settle, to try or not to try, and/or to appeal or not to appeal all Assigned Causes of Action, as each of them determine in the exercise of its business judgment and without any further approval of the Bankruptcy Court thereof.  The Reorganized Debtor, the Board of Directors, Sun and their respective attorneys and other professionals shall have no liability for the outcome of their decisions.

### 16.    No Liability for Solicitation or Participation

As specified in § 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sales, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 17.    Class 6 Creditor Trust

      **a.**      **Class 6 Creditor Trustees.**  The Confirmation Order shall approve, as of the Effective Date, the Class 6 Creditor Trust Agreement, which agreement shall provide for the appointment of no less than three (3) members to act as the Class 6 Creditor Trustees to administer the Class 6 Creditor Trust, for the benefit of holders of Allowed General Unsecured Claims. The Class 6 Creditor Trustees shall serve without any bond and shall act in accordance with the Class 6 Creditor Trust Agreement.

      **b.**      **Compensation of Class 6 Creditor Trustees.**  The Class 6 Creditor Trustees shall be entitled to receive, on a monthly basis, payment of reasonable fees and reimbursement of reasonable expenses without further Court approval from the assets of the Class 6 Creditor Trust, in accordance with the Class 6 Creditor Trust Agreement.  Each Class 6 Creditor Trustee shall serve for the duration of the Class 6 Creditor Trust, subject to earlier death, resignation, incapacity or removal as specifically provided in the Class 6 Creditor Trust Agreement.

        **c.**      **Funding of the Creditor Trust.**  The Class 6 Creditor Trust will be funded solely with the Class 6 Creditor Trust Assets.

        **d.**      **Powers and Duties.**  The Class 6 Creditor Trust shall have the following rights, powers and duties:

        (1)     Hold all of the Class 6 Creditor Trust Assets and exercise full right, power and discretion to manage such property and execute, acknowledge and deliver any and all instruments as may be appropriate or necessary as determined by the Class 6 Creditor Trust in its discretion;

        (2)     Receive payments under the General Unsecured Promissory Note for the benefit of holders of Allowed General Unsecured Claims and any modifications, amendments, or other duties related to the General Unsecured Promissory Note after the Effective Date;

        (3)     Make interim and final distributions to the Holders of Allowed General Unsecured Claims;

        (4)     File all tax and regulatory forms, returns, reports and other documents required with respect to the Class 6 Creditor Trust;

        (5)     File suit or any appropriate motion for relief in the Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the exercise of the Class 6 Creditor Trust's rights, powers or duties; and

        (6)     Retain professionals, including accountants and attorneys, at the expense of the Class 6 Creditor Trust, to assist the Class 6 Creditor Trustees in the performance of their duties.

        **e.**      **The Termination of the Class 6 Creditor Trust.**  The Class 6 Creditor Trust shall be irrevocable.  The Class 6 Creditor Trust shall terminate when the Class 6 Creditor Trustees have performed all of their duties under the Plan and the Class 6 Creditor Trust Agreement, including the final distribution of all the property of the Class 6 Creditor Trust in respect of Allowed General Unsecured Claims, which date shall not be more than nine (9) years and one (1) month after the Effective Date; provided, however, the Court may upon good cause shown order the Class 6 Creditor Trust to remain open so long as shall be necessary to liquidate and distribute all its property.  Upon good cause shown, the Court may modify the rights, powers and duties of the Class 6 Creditor Trust or the procedures for appointing successors to the Class 6 Creditor Trustees in light of material changes in circumstances upon the motion of the Class 6 Creditor Trust.

        **f.**      **Additional Provisions of the Class 6 Creditor Trust Agreement.**  In addition to the provisions in the Plan with respect to the Class 6 Creditor Trust, the Class 6 Creditor Trust Agreement will provide for, among other things, other actions to be taken by the Class 6 Creditor Trust and the Class 6 Creditor Trustees, including the removal of

Class 6 Creditor Trustees or appointment of successor Class 6 Creditor Trustees, the liability of the Class 6 Creditor Trustees, the effect of actions by the Class 6 Creditor Trustees, and the indemnification of the Class 6 Creditor Trustees. To the extent not set forth in the Plan, the functions and procedures applicable to the Class 6 Creditor Trust and the powers and duties of the Class 6 Creditor Trustees and the rights of the holders of Interests in the Class 6 Creditor Trust shall be governed by the provisions of the Class 6 Creditor Trust Agreement.

**F.      Conditions Precedent to Effectiveness of the Plan**

**1.      Conditions to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.2 of the Plan:

**a.**      The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, Section 10.1(a) of the Plan shall be deemed satisfied unless the effect of the appeal could reasonably be expected to be adverse to the business, operations, property, condition (financial or otherwise) or prospects of the Reorganized Debtor;

**b.**      All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtor and shall have been effected or executed as applicable;

**c.**      Tuft shall have executed the Guarantees and the Recapitalization Agreement;

**d.**      The Debtor shall have entered into the Sun Term Loan;

**e.**      The Debtor shall have obtained any new hospital, pharmacy or laboratory licenses that may be required for operation of the Hospital by the Reorganized Debtor.

**f.**      HCREIT and Sun shall have entered into the Intercreditor Agreement;

**g.**      The Debtor shall have sufficient Cash on hand to make all required cash payments on the Effective Date; and

**h.**      The Debtor shall have entered into a settlement with the Office of Inspector General concerning that certain self-disclosure letter, dated August 8, 2008, providing for a payment of $764,250 to the United States of America on the Effective Date.

### 2.       Waiver of Conditions

The conditions set forth in Section 10.1(a), (b) and (e) of the Plan may be waived by the Debtor, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### 3.       Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.2 of the Plan, then upon motion by the Debtor or any party-in-interest made before the time that each of such conditions has been satisfied and upon notice to such parties-in-interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section 10.3 of the Plan, (1) the Plan will be null and void in all respects; and (2) nothing contained in the Plan will:  (a) constitute a waiver or release of any claims by or against the Debtor; or (b) prejudice in any manner the rights of the Debtor or any other party-in-interest.

## G.       Releases and Related Matters

### 1.       General Releases by Holders of Claims

As of the Effective Date, in consideration for the obligations of the Debtor and the Reorganized Debtor under the Plan and the cash and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce obligations under or reserved by the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder and the right to contest Fee Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan that such Person has, had or may have against (i) the Debtor, (ii) the Debtor's directors, officers, employees, agents and attorneys serving in that capacity as of the Confirmation Date, (iii) HCREIT and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (iv) Sun and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (v) Serra, and (vi) the Envision Entities.

**2.     Releases by the Debtor, Sun and HCREIT**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Sun, HCREIT, the Debtor and the Reorganized Debtor and any and all Persons claiming through or on behalf of the Debtor or the Reorganized Debtor including, without limitation, the Committee, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case or the Plan, and that may be asserted by or on behalf of Sun, HCREIT, the Debtor or its Estate or the Reorganized Debtor against (i) the Debtor's directors, officers, employees, agents and attorneys serving in that capacity as of the Confirmation Date, (ii) HCREIT and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (iii) Sun and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (iv) Serra, and (v) the Envision Entities, other than any Assigned Causes of Action, which are expressly reserved; provided, however, that (x) Sun is not, and shall not be deemed to be, releasing any party included in (iii) above, and (y) HCREIT is not, and shall not be deemed to be, releasing any party included in (ii) above.

**3.     Serra Release**

In consideration for the releases set forth in section 13.4(a) and (b) of the Plan and pursuant to § 1123(b)(3)(A) of the Bankruptcy Code, as of the Effective Date, Serra will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that may be asserted by or on behalf of Serra against (i) the Debtor or its Estate including, without limitation, with respect to any Proof of Claim filed against the Estate, (ii) the Debtor's directors, officers, employees, agents and attorneys serving in that capacity as of the Confirmation Date, (iii) HCREIT and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (iv) Sun and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, and (vi) the Envision Entities.

**4.     Basis for Serra Release**

As set forth above, pursuant to § 1123(b)(3)(A) of the Bankruptcy Code, the Debtor and the Estate are releasing all claims and Causes of Action that the Debtor or the Estate could assert against Serra.  In return, Serra is releasing all Claims that it could assert against the Debtor and the Estate, including its Proof of Claim in the amount of $2,584,623.69 for amounts allegedly

owed under Serra's agreements with the Debtor. While the Debtor believes that it could assert setoffs against Serra's Proof of Claim and/or assert certain affirmative claims against Serra should the matter have been litigated, the settlement with Serra results in a significant reduction of the pool of General Unsecured Claims without incurring any litigation costs. The Debtor therefore believes that the settlement is fair and reasonable and in the best interests of the Estate.

### 5.    Treatment of the Envision Claim and Release

The $14.7 million Envision Claim shall be treated as (a) an Allowed General Unsecured Claim in Class 6 in the amount of $5,000,000 (the "Allowed Envision Claim"); and (b) an Allowed Equity Interest in Class 8 in the amount of $9,700,000. In consideration for the aforementioned treatment of the Envision Claim and the releases set forth in section 13.4(b) of the Plan and pursuant to § 1123(b)(3)(A) of the Bankruptcy Code, as of the Effective Date, the Envision Entities will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that may be asserted by or on behalf of the Envision Entities against (i) the Debtor or its Estate including, without limitation, with respect to any Proof of Claim filed against the Estate, other than the Allowed Envision Claim, (ii) the Debtor's directors, officers, employees, agents and attorneys serving in that capacity as of the Confirmation Date, (iii) HCREIT and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, (iv) Sun and its current and former officers, directors, shareholders, affiliates, employees, agents, attorneys and other professionals, and (v) Serra.

### 6.    Basis for Envision Settlement

As set forth above, the Debtor has reached a settlement with the trustee for Envision Hospital Corporation (the "Envision Trustee") that is incorporated into the Plan pursuant to § 1123(b)(3)(A) of the Bankruptcy Code. The Envision Trustee asserted that the $14.7 million Envision Claim should be allowed in full because the Claim amount reflects intercompany transfers made by Envision Hospital Corporation for the benefit of the Debtor. The Debtor disputed the arguments made by the Envision Trustee and asserted that due to, among other things, the lack of any documentation of the alleged advances made by Envision Hospital Corporation and the close corporate relationship between the parties, the Envision Claim should be treated as an Equity Interest. The settlement of the Envision Claim for (a) an Allowed General Unsecured Claim in Class 6 in the amount of $5,000,000; and (b) an Allowed Equity Interest in Class 8 in the amount of $9,700,000, is well within the reasonable range of litigation outcomes and is in the best interests of the Estate.

### 7.    Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any entity or person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including pursuant to the releases in Section 13.4 of the Plan.

**H.    Treatment of Executory Contracts and Unexpired Leases**

**1.    Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases that exist between the Debtor and any Person shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed prior to the Effective Date. Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("Rejection Claims") shall be classified in Class 6 under the Plan. Notwithstanding anything to the contrary in the Plan, the Debtor is not rejecting its Collective Bargaining Agreements with SEIU United Healthcare Workers West and Service Employees International Union Local 121 RN dated June 1, 2010, which shall remain binding after the Effective Date.

**2.    Bar Date for Filing Rejection Claims**

A Proof of Claim asserting a Rejection Claim shall be filed with the Bankruptcy Court on or before the fortieth (40th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Reorganized Debtor.

**I.    Modification of the Plan**

The Debtor may propose amendments to or modifications of the Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order. After the Confirmation Date, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of Claimants are not materially and adversely affected.

**J.    Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**K.    Dissolution of the Committee**

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Fee Claims. The Professionals retained by the Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date,

except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 2.2 of the Plan or any objections thereto.

## V.    THE REORGANIZED DEBTOR

### A.    The Recapitalization Agreement

On the Effective Date, the Reorganized Debtor shall enter into the Recapitalization Agreement, which shall be approved pursuant to the Confirmation Order.

Pursuant to the terms of the Recapitalization Agreement, 100% of the New Stock in the Reorganized Debtor will be issued to Paul R. Tuft ("Tuft") on the Effective Date, simultaneously with the vesting of assets in the Reorganized Debtor. A copy of the Recapitalization Agreement to be entered into by the Reorganized Debtor and Tuft is attached hereto as <u>Exhibit D</u>.

Tuft is the current Chairman of the Debtor's board of directors. Tuft also owns approximately 84% of the shares in Envision Hospital Corporation ("Envision"), the Debtor's parent company. Envision is currently the debtor in its own chapter 7 bankruptcy case pending in the United States Bankruptcy Court for the District of Arizona, Case No. 09-09240. The chapter 7 trustee for Envision's estate has filed an unsecured, non-priority claim against the Debtor in the amount of $14,700,000 (the "Envision Claim"). As set forth in Section IV.G.5 and 6 above, the Envision Claim shall be treated under the Plan as (a) an Allowed General Unsecured Claim in Class 6 in the amount of $5,000,000; and (b) an Allowed Equity Interest in Class 8 in the amount of $9,700,000.

Pursuant to the Recapitalization Agreement, Tuft will own the New Stock. In consideration for the issuance of the New Stock to Tuft, Tuft is personally guaranteeing the Reorganized Debtor's obligations under the Sun Term Loan, the HCREIT Promissory Note, the Sun Promissory Note and the General Unsecured Promissory Note. Tuft, therefore, is providing personal guarantees in the aggregate amount of approximately $33 million under the Plan. Without Tuft's Guarantees, the Debtor believes that HCREIT would likely not provide exit financing to the Debtor and HCREIT and Sun likely would not support confirmation of the Plan. The Debtor and its Estate are also providing a release to Tuft pursuant to Section 13.4(b) of the Plan, as set forth in more detail above in Section IV.G.2, "Releases by the Debtor."

The execution of the Recapitalization Agreement also has significant potential tax benefits to the Reorganized Debtor. Because it does not cause an ownership change for purposes of Code section 382, the Recapitalization Agreement will preserve the net operating losses and net operating loss carryforwards of the Debtor that remain after taking into account any cancellation of debt income that results from the Plan. See Section IX.A.2, "United States Federal Income Tax Consequences to the Debtor – Limitation on NOLs and Other Tax Attributes".

**B.      Business and Property of the Reorganized Debtor**

After the Effective Date, the Reorganized Debtor will continue to operate the Hospital in its current location in Sun Valley, CA as a community hospital.  The Hospital will continue to be a disproportionate share hospital and will continue to serve the poor and uninsured.  The Hospital will continue to offer comprehensive inpatient and outpatient services to its patients including, but not limited to, its core areas of sub-acute, adult psychiatric care, obstetrics and emergency care.

**C.      Selected Historical Financial Information**

Attached hereto as <u>Exhibit E</u> is selected historical financial information on the Debtor's operations.

**D.      Projected Financial Information**

Attached hereto as <u>Exhibit F</u> are the financial projections prepared by the Debtor for the Reorganized Debtor's operations through December 31, 2012 (the "Projections").  These Projections support, among other things, the Debtor's discussion of the feasibility of the Plan pursuant to § 1129(a)(11) of the Bankruptcy Code, discussed in Section VI.D.2 below.

**VI.      CONFIRMATION OF THE PLAN**

**A.      Introduction**

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed. It requires further that a disclosure statement concerning such plan be adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

If the Plan is confirmed, the Debtor expects the Effective Date to occur no later than fifteen (15) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met.  Thus, even if the requisite vote is achieved for the Voting Classes, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

**B.      Voting**

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Equity Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan.  A holder of a Claim or Equity Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in § 1124 of the Bankruptcy Code is considered Impaired.  Pursuant to § 1126(f) of the Bankruptcy Code, holders

of Claims that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.  Pursuant to § 1126(g) of the Bankruptcy Code, any holders of Claims or Equity Interests that do not receive or retain any property under the Plan on account of such Claims or Equity Interests are conclusively deemed to have rejected the Plan and are not entitled to vote.

Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Voting Class or (ii) are otherwise permitted by the Bankruptcy Code to vote.

### C.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote.  The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote.  Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan.  Except in the context of a "cram down" pursuant to § 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accept the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Equity Interests, the Debtor has the right, assuming that at least one Class of Impaired Claims or Equity Interests has accepted the Plan, to request confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code.   Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes.  This procedure is commonly referred to in bankruptcy parlance as "cram down."  As such, if any Voting Class votes to reject the Plan, the Debtor will request confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

### D.    Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment

made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

• The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider.

• With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

• Each class of claims has either accepted the plan or is not impaired under the plan, subject to Section VI.D.4, "Cram Down."

• Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expense claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief, of a value, as of the effective date, equal to the allowed amount of such claim.

• If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

• Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, the Debtor believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain of the relevant statutory confirmation requirements.

### 1.      Best Interests of Holders of Claims and Equity Interests

The "best interests" test requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims and equity interests will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of Claims or Equity Interests would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Debtor's Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtor would consist of the net proceeds from the disposition of the Debtor's assets, augmented by any cash held by the Debtor.

The Liquidation Value available to holders of General Unsecured Claims and Equity Interests would be reduced, first, by the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred in the Chapter 11 Case that are allowed in the chapter 7 case, and litigation costs and claims arising from the operations of the Debtor during the pendency of the chapter 11 cases.  The liquidation itself could trigger certain Priority Claims, such as claims for severance pay.

The information contained on Exhibit G hereto provides a summary of the Liquidation Value of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Debtor's assets.  As more fully described on Exhibit F, the liquidation analysis is based on a number of estimates and assumptions that are subject to significant uncertainties, including estimates and assumptions relating to the proceeds of sales of assets, the timing of such sales, the costs of liquidation and certain tax matters.  While the Debtor believes that these estimates and assumptions are reasonable for the purpose of preparing a hypothetical chapter 7 liquidation analysis, no assurance exists that such estimates and assumptions would be valid if the Debtor was, in fact, to be liquidated.

Based on the liquidation analysis set forth on Exhibit G, the Debtor believes that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive under a chapter 7 liquidation.

In an actual liquidation of the Debtor, distributions to holders of Claims would be delayed by the chapter 7 process.  This delay would materially reduce the amount determined on a present value basis available for distribution to creditors.  The hypothetical chapter 7 liquidation of the Debtor is assumed to commence on December 31, 2010 and to be completed within approximately three months thereafter.  The Liquidation Analysis assumes that

distributions are made by the chapter 7 trustee beginning approximately five months following commencement of the liquidation and completed within three months thereafter. As a result, the Debtor believes the value of the liquidation distributions on a present value basis determined as of the projected Effective Date would be less than the value distributable under the Plan to each Class of Claims including, but not limited to, all secured Claims.

In sum, the Debtor believes that a chapter 7 liquidation of the Debtor would result in a substantial diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan because of, among other factors: (a) the failure to maximize the going concern value of the Debtor's assets; (b) the liquidation of assets at a distressed value in chapter 7; (c) the substantial costs attendant to shutting down the Hospital in compliance with regulatory requirements; (d) the liquidation of assets during a stagnant economy, resulting in a much less robust market for the Debtor's real estate and other assets; (e) additional costs and expenses involved in the appointment of a trustee, attorneys, accountants and other professionals to assist the trustee in the chapter 7 case; (f) additional expenses and Claims, including potential Administrative Expense Claims and Priority Claims, that may arise from the cessation of operations and the conversion of the Chapter 11 Case to chapter 7; and (g) the substantial time that would elapse before entities would receive any distribution in respect of their Claims. Consequently, the Debtor believes that the Plan will provide a substantially greater return to holders of Claims than would a chapter 7 liquidation.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared the Projections.

The Projections provide that the Reorganized Debtor should be able to meet all of its obligations under the Plan and is not likely to be liquidated after the Effective Date. Among other things, the Projections provide that the Reorganized Debtor should have the wherewithal to make all interest and other debt payments required under the Plan including, but not limited to, any payments due to holders of Allowed HCREIT Claims, Allowed Sun Claims and Allowed General Unsecured Claims, as well as meet its obligations under the Sun Term Loan.

Given the uncertain nature of, among other things, government reimbursement policies and programs, the Debtor's patient census and other matters, there is no guarantee that the Reorganized Debtor's actual performance will mirror the Projections. However, the Debtor believes, based on the Projections, that the Reorganized Debtor should be able to meet its obligations under the Plan. As such, based upon the Projections, the Debtor believes that the Debtor's reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 3.    Acceptance by Impaired Classes

A class is impaired under a plan unless, with respect to each claim of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights.  A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances to such class is not required.

With respect to the Plan, holders of Claims in Classes 1 are Unimpaired and are deemed to have accepted the Plan.  Holders of Claims in Class 7 and Equity Interests in Class 8 are Impaired and are deemed to have rejected the Plan by virtue of receiving no distributions thereunder.  The holders of Claims in Classes 2, 3, 4, 5 and 6 are Impaired and entitled to vote on the Plan.

### 4.    Cram Down

A plan is accepted by an impaired class of claims or interests if holders of at least two-thirds in dollar amount and a majority in number of claims or interests in that class vote to accept the plan.  Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.  The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in § 1129(b) of the Bankruptcy Code.  The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of § 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims and Equity Interests that is impaired under, and has not accepted, the Plan.  The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or interests receives full compensation for its allowed claims or interests, no holder of allowed claims or interests in any junior class may receive or retain any property on account of such claims or interests.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank.  The Debtor does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

The Debtor intends to seek "cram down" of the Plan on Classes 7 and 8, which are deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code by virtue of receiving no distributions thereunder, and on any other Class rejecting the Plan.  Nevertheless, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of § 1129(b) of the Bankruptcy Code.

### 5.    Classification of Claims

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code that require that a plan place each claim into a class with other claims that are "substantially similar."

### E.    Effect of Confirmation of the Plan

### 1.    Discharge of the Debtor

Pursuant to § 1141(d) of the Bankruptcy Code and, except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded and the payments and distributions to be made and the treatment under the Plan shall be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge, and release of any and all existing debts and Claims and termination of all Equity Interests of any kind, nature, or description whatsoever against or in the Debtor, the Reorganized Debtor, their property, the Debtor's assets, or the Estate, and shall effect a full and complete release, discharge, and termination of all Liens, security interests, or other claims, interests, or encumbrances upon all of the Debtor's assets and property.    Further, all Persons are precluded from asserting, against the Debtor or the Reorganized Debtor or their respective successors, or any property that is to be distributed under the terms of the Plan, any Claims, obligations, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided for in the Plan, or the Confirmation Order, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed; or (c) the Claimant based upon such debt has accepted the Plan.    Except as otherwise provided in the Plan or the Confirmation Order, all Claimants and holders of Equity Interests arising prior to the Effective Date shall be permanently barred and enjoined from asserting against the Reorganized Debtor or the Debtor, or their successors or property, or the Debtor's assets, any of the following actions on account of such Claim or Equity Interest:  (i) commencing or continuing in any manner any action or other proceeding on account of such Claim or Equity Interest against the Reorganized Debtor, the Debtor, or the property to be distributed under the terms of the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Reorganized Debtor, the Debtor or any of the property to be distributed under the terms of the Plan, other than as permitted under sub-paragraph (i) above; (iii) creating, perfecting, or enforcing any Lien or encumbrance against property of the Reorganized Debtor, the Debtor, or any property to be distributed under the terms of the Plan; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due any Debtor, the Reorganized Debtor, their assets or any other property of the Debtor, the Reorganized Debtor, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.  The foregoing discharge, release and injunction are an integral part of the Plan and are essential to its implementation.  The Debtor and the Reorganized Debtor shall have the right to independently seek the enforcement of the discharge, release and injunction set forth in Section 11.1 of the Plan.

### 2.    No Waiver of Discharge

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtor upon confirmation of the Plan by § 1141 of the Bankruptcy Code

### 3.    Binding Effect

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time they are replaced with the injunction set forth in Section 11.1 of the Plan.

### 4.    Term of Injunctions or Stays

Except with respect to Claims specifically Allowed under the Plan, the Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against such Claimant; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Claimant.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    Risk that Distributions will be Less than Estimated by the Debtor

The distributions and recoveries for holders of Claims set forth in this Disclosure Statement are based on the Debtor's estimates of Allowed Claims as of September 30, 2010. The Debtor projects that the Claims asserted against the Debtor will be resolved in and reduced to an amount that approximates their estimates and may seek an order or orders from the Bankruptcy Court estimating the maximum dollar amount of Allowed Claims and Disputed Claims in various Classes or otherwise determining and fixing the amount of any Disputed Claims Reserve.  This estimate will be used to calculate and fix distributions to holders of Allowed Claims and the amount of each Disputed Claims Reserve.  There can be no assurance, however, that such estimates will prove accurate.  In addition, if and to the extent the Debtor has underestimated the amount of Allowed Claims or Disputed Claims Reserves for Administrative Expense Claims, Other Secured Claims, Secured Tax Claims, Priority Tax Claims, Priority

Claims or General Unsecured Claims, the Debtor could be required to redirect cash to such Disputed Claims Reserves, resulting in, among other things, a potential reduction of cash available for operations or a lower percentage recovery available for holders of General Unsecured Claims. Therefore, the distributions discussed herein could significantly and materially differ from the actual distributions made under the Plan.

Except for Claims that are Allowed under the Plan, the Debtor reserves the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim whose Claim is subject to a successful objection. Any such holder may not receive the estimated distributions set forth herein.

### B.    Liquidity and Financing Risks

Although the Debtor projects that the Reorganized Debtor will have sufficient liquidity to operate its Hospital through completion of all payments required to be made under the Plan, there is no assurance that the Reorganized Debtor will generate sufficient revenues in the upcoming months and years to cover all such payments along with all expenditures incurred in the Reorganized Debtor's business.

In addition, a condition to the Effective Date of the Plan is that the Debtor shall have entered into the Sun Term Loan in order to have access to financing after the Effective Date. While the Debtor believes that there is no material impediment to entering into the Sun Term Loan, there can be no assurance that it will be able to do so. Continued access to the financing provided under the Sun Term Loan, or an alternative source of financing, is also important to the stability of the Reorganized Debtor's operations and ability to make all payments required to be made under the Plan. The Debtor believes that the Reorganized Debtor will have access to the Sun Term Loan, or a comparable financing source, but there is no guarantee that such financing will remain available.

### C.    Office of Inspector General Issues and Proposed Settlement

On August 20, 2008, the Debtor's then current CEO, Mr. Casey Fatch, submitted a self-disclosure letter (the "Self-Disclosure Letter") to the Office of Inspector General (the "OIG") for the United States Department of Health & Human Services ("HHS"), pursuant to the Provider Self-Disclosure Program Protocols (the "Self-Disclosure Program"). The Self-Disclosure Letter detailed potential Stark Law and Anti-Kickback Statute violations committed by the Hospital from 2004 to 2008.

The Self-Disclosure Letter estimated that the aforementioned violations resulted in the Hospital receiving $2.7 million in improper payments from HHS between 2004 and 2008. Over the past twelve months, the Debtor has been negotiating with the OIG on a reduction of the $2.7 million amount referenced in the Self-Disclosure Letter, as well as an extended repayment plan. More specifically, the Debtor has proposed to repay $764,250 (plus interest at an annual rate of 2.875%) to HHS over three (3) years. The Debtor's settlement proposal is currently under consideration by the OIG.

As of the date of this Disclosure Statement, the parties have reached a settlement in principal based on the Debtor's settlement proposal that must be documented.  Entry into a settlement with OIG substantially on the terms proposed by the Debtor is a condition to the Effective Date of the Plan.  If for any reason the settlement is not consummated, there is a significant risk that HHS will attempt to recover the $2.7 million from the Debtor.

Moreover, if the OIG does not accept the Debtor's settlement proposal, the OIG may also revoke the Debtor's right to take advantage of the reduced penalties only available under the Self-Disclosure Program.  Thus, if the Debtor is removed from the Self-Disclosure Program, the OIG (in concert with the United States Department of Justice) may attempt to file suit against the Debtor and attempt to recover an amount in excess of $2.7 million.  Lawsuits of this sort almost always injure a hospital's reputation and could expose the Debtor to serious financial injury and even a forced closure.

### D.    Priority and Secured Tax Claim Risks

LA County and LA City have asserted Priority Tax Claims against the Estate in the combined amount approximately $2.1 million.  LA County has also asserted a Secured Tax Claim against the Estate in the amount of $1,136,283.98.  The Debtor believes that the aggregate Allowed amount of Priority Tax Claims will be closer to $1.6 million (or less) due to, among other things, (a) the inclusion of unrecoverable post-petition penalties on account of pre-petition claims in the Claims of both LA County and LA City, and (b) the inclusion of amounts that are not recoverable as a Priority Tax Claim under § 507(a)(8)(B) of the Bankruptcy Code in the Claim of LA County.  Moreover, the Debtor believes the Allowed amount of LA County's Secured Tax Claim will be approximately $800,000 due to, among other things, the Claim includes (a) unenforceable post-petition penalties, and (b) amounts that were paid by the Debtor.

There is no assurance, however, that the Debtor's estimates of the Allowed amount of the Claims asserted by LA County and LA City are accurate.  Among other things, LA County disputes that post-petition redemption penalties that are deemed to be an assessment of interest under the California Revenue and Taxation Code and charges are not recoverable as part of its Secured Tax Claim.  Should the Claims of LA County and/or LA City be Allowed as Priority Tax Claims and/or Secured Tax Claims in amounts exceeding the Debtor's estimates, the Debtor could have significant additional obligations to such Claimants from the Effective Date through February 19, 2014 in accordance with Sections 2.3 and 5.4 of the Plan and § 1129(a)(9)(C)-(D) of the Bankruptcy Code.

### E.    Risk of Collection on Guarantees

Tuft is providing Guarantees in the aggregate amount of approximately $33 million under the Plan.  Given the magnitude of the Guarantees, the holders of HCREIT Claims, Sun Claims and General Unsecured Claims should not rely solely on the Guarantees for repayment in the event that the Debtor defaults on any payment owed under the notes issued to such Claimants under the Plan.

48

**F.        Risk of Non-Confirmation of the Plan**

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 Case will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims as the terms of the Plan.

**G.        Non-Consensual Confirmation of the Plan**

Pursuant to the "cram down" provisions of § 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes of Claims, so long as at least one Impaired Class of Claims has accepted the Plan.  For a description of the "cram down" provisions of the Bankruptcy Code, see Section VI.D.4, "Cram Down."

**H.        Alternatives to the Plan**

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under §§ 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code.  After careful review of the estimated recoveries in a chapter 7 liquidation scenario and as set more in more detail in Section VI.D.1 above and on Exhibit F hereto, the Debtor has concluded that recoveries to holders of Claims under the Plan will be higher than the recoveries in a chapter 7 case.  Moreover, distributions to holders of Claims will occur much sooner and have greater value to holders of Claims under the Plan than under a chapter 7 liquidation.  Should the Plan not be confirmed, it is likely that the distributions to holders of Claims would be delayed and would be materially reduced by the additional fees and other costs associated with a chapter 7 liquidation.

If the Plan is not confirmed, the Debtor, or any other party-in-interest, may attempt to formulate an alternative chapter 11 plan, which might provide for a reorganization or for the liquidation of the Debtor's assets other than as provided under the Plan.  Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay distributions to holders of Claims and may not result in the financing and concessions by certain of the Debtor's creditors that made possible the formulation of the Plan and the distributions to creditors thereunder.  In addition, due to the incurrence of additional Administrative Expense Claims during the period of any delay in formulating an alternative Plan, distributions to holders of Claims could be adversely impacted.

Accordingly, the Debtor believes that the Plan offers the best prospect of recovery for the holders of Claims against the Debtor.

# VIII.   SECURITIES LAW MATTERS

### A.     General

The Plan provides for the Reorganized Debtor to issue New Stock pursuant to Sections 6.5 and 6.6 of the Plan.  The Debtor believes that the New Stock constitute "securities," as defined in Section 2(a)(1) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a et seq. (the "Securities Act"), § 101(49) of the Bankruptcy Code and applicable state securities laws.

### B.     Issuance of New Stock

The Debtor believes that the offer and sale of the New Stock pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security generally do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for such claim against, interest in, or claim for administrative expense against, the debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon § 1145 of the Bankruptcy Code, the New Stock will not be registered under the Securities Act or any state securities laws.

### C.     Resale of New Stock

Any subsequent transfers of the New Stock by the holder or holders thereof will need to be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws.  The Debtor recommends that the recipient of the New Stock consult with his own legal advisors as to the availability of any such exemption from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws in any given instance and as to any applicable requirements or conditions to such availability.

# IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain U.S. federal income tax consequences to the Debtor and to certain United States holders of Allowed Claims that are expected to result from implementation of the Plan.   This discussion does not address the federal income tax consequences of the Plan to holders of Claims who are deemed to have rejected the Plan under § 1126 of the Bankruptcy Code, holders who are deemed to have accepted the Plan under § 1126 of the Bankruptcy Code, or non-United States holders.  For purposes of the following discussion, a "United States holder" is a holder of Claims that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the

trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), final or proposed U.S. Treasury Regulations, and judicial and administrative interpretations thereof, all as available on or before the date of this Disclosure Statement. No ruling from the Internal Revenue Service ("IRS") or opinion of counsel has been or will be sought on the issues discussed in this summary, and there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below. Moreover, legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may be retroactive and could affect the tax consequences discussed below.

This summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may apply to any holder of Allowed Claims. This summary does not address the tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). In addition, this discussion does not address any aspect of state, local or foreign taxation, or any estate or gift tax consequences of the Plan.

This summary is not intended to be legal or tax advice to any holder of Allowed Claims. The tax consequences to holders of Allowed Claims may vary based upon the individual circumstances of the holder. Each holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Plan in light of the holder's circumstances.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Code, (ii) such discussion is written in connection with the promotion of the transactions or matters discussed herein, and (iii) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

### A.    United States Federal Income Tax Consequences to the Debtor

#### 1.    Cancellation of Indebtedness Income

Under the Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Code section 108 provides an exception to this general rule if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Code section 108 requires the amount of COD income so excluded from gross income to be applied to reduce the following tax attributes of the taxpayer in the following order: (a) any net operating loss ("NOL") for the taxable year of the discharge and any net operating loss carryforwards to such year; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtor's depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards.  However, the Debtor can elect under Code section 108(b)(5) to apply the tax attribute reduction first to reduce the tax basis of its depreciable property (without regard to the amount of its liabilities) and then to reduce NOLs and other tax attributes.  A reduction in tax attributes under the foregoing rules does not occur until the end of the taxable year or, in the case of an asset basis reduction, the first day of the taxable year following the taxable year, in which the COD income is realized.  Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Under the Plan, holders of Subordinated Claims will not receive any property on account of their Claims, and holders of certain other Claims will receive a new debt instrument, or a combination of cash and a new debt instrument, which will constitute less than full payment on their Claims.  The Debtor's liability to the holders of Claims in excess of the amount satisfied by distributions under the Plan will be discharged.  As a result of the discharge of Claims pursuant to the Plan, the Debtor is expected to realize significant COD.  Any COD income that the Debtor realizes as a result of such discharge should be excluded from the Debtor's gross income pursuant to the bankruptcy exception under Code section 108 described in the immediately preceding paragraph.  The exclusion of COD income under this exception will result in a reduction of certain tax attributes of the Debtor.  The Debtor has not determined whether it will make the election under Code section 108(b)(5) to apply the COD income to reduce the basis of depreciable property before reducing other tax attributes.

#### 2.    Limitation on NOLs and Other Tax Attributes

The Debtor is expected to have substantial NOLs in, and substantial NOL carryforwards to the year ending December 31, 2010 and, to the extent not used or eliminated in that year, to subsequent years.  The amount of such NOLs and NOL carryforwards remains subject to review and adjustment.

Under Code section 382, if a corporation undergoes an "ownership change," the amount of prechange losses (NOL carryforwards from periods before the ownership change and certain "built-in" losses and deductions that are economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income is generally subject to an annual limitation (the "Annual Limitation").   Code section 383 extends and applies the Annual Limitation to carryforwards of general business credits, minimum tax credits, capital losses, and foreign tax credits, so that the total reduction in tax in a post-change year from the carryover of such additional items, along with the NOLs and recognized built-in losses, from pre-change periods is, in the aggregate, limited by the Annual Limitation.

In general, the amount of the Annual Limitation to which a corporation that has undergone an ownership change is subject under Code sections 382 and 383 is equal to the product of (a) the fair market value of stock of the corporation immediately before the ownership change (subject to various adjustments), multiplied by (b) the highest of the adjusted federal long-term tax-exempt rates in effect for any month in the 3-calendar months ending with the month in which the ownership change occurs.  Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year.  For any corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value is generally determined immediately after (rather than before) the ownership change by taking into account the increase in stock value from the surrender or cancellation of any creditors' claims, with certain adjustments.  Notwithstanding the foregoing general rule, however, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero (potentially increased by certain recognized built-in gains).

In general, an "ownership change" occurs under Code section 382 if the percentage of stock of the corporation owned actually or constructively by one or more "5-percent shareholders" increases by more than 50 percentage points by value on any "testing date" (taking into account all relevant adjustments as of the end of a "testing date") as compared to the lowest percentage of stock of the corporation owned by those 5-percent shareholders at any time during the statutory "testing period" (generally, the past three years or, if shorter, since the last ownership change).  For purposes of applying this test, stock owned by a corporation is deemed to be owned proportionately by its shareholders and not by the corporation.  Generally, a "testing date" is any date there is any change in the stock ownership that affects the percentage stock ownership of a 5-percent shareholders.  A "5-percent shareholder" is one who owns, directly or indirectly, at least five percent of the stock of the corporation (not including certain nonvoting nonparticipating preferred stock), and stock owned by shareholders, who are not 5-percent shareholders (hereinafter referred to as a "public group"), is treated as being owned by one or more separate 5-percent shareholder.

For at least three years prior to the Effective Date, more than 80% of the stock of the Debtor was and is constructively owned (for purposes of Code section 382) by Tuft.  After the Recapitalization Agreement, 100% of the stock of the Debtor will be owned (for purposes of Code section 382) by Tuft.  Accordingly, the Debtor anticipates that the Recapitalization Agreement will not produce an "ownership change" within the meaning of Code section 382.  As

a result, the Debtor's ability to use any pre-Effective Date NOLs and other tax attributes to offset its income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made should not be subject to the Annual Limitation.  However, the Debtor's loss carryforwards will be subject to limitations if the Debtor experiences a future ownership change or if it does not continue its business enterprise for at least two years following the Effective Date.

Tuft's tax counsel, Mr. John Becker, Esq. ("Mr. Becker"), who was also the former tax counsel for Envision, is currently estimating that the NOL carryforwards available to Pacifica if the Recapitalization Agreement with Tuft is executed will be in the range of approximately $8 million to $23 million.  According to Mr. Becker, the primary variable relating to the ultimate NOL carry forward calculation relates to the characterization for federal income tax purposes of the unsecured claim filed by Envision.  A copy of Mr. Becker's opinion letter is attached hereto as Exhibit H.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for such year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards, in contrast to the regular tax which generally permits a corporation to offset all of its taxable income by NOL carryovers from prior years.

### B.    United States Federal Income Tax Consequences to Holders of Claims

Pursuant to and in accordance with the Plan, holders of Allowed HCREIT Claims will receive the HCREIT Promissory Note, holders of Allowed Sun Claims will receive cash and the Sun Promissory Note, and holders of Allowed General Unsecured Claims will receive the General Unsecured Promissory Note. (Each of the HCREIT Promissory Note, the Sun Promissory Note, and the General Unsecured Promissory Note is hereinafter referred to as a "New Note.")

The federal income tax consequences of the receipt of New Notes by holders of the aforementioned Allowed Claims will vary, depending upon, among other things, whether such holders' Claims and the New Notes constitute "securities" for federal income tax purposes.  The term "security" is not defined in the Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  In general, the determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt.  Certain authorities have indicated that the length of the initial term of the debt instrument is one of the more important factors in making such a determination.  Under these authorities, a weighted average maturity at issuance of five (5) years or less (e.g., trade debt and revolving credit obligations) is evidence that the debt is not a security, whereas a weighted average maturity of ten (10) years or more supports the argument that the debt is a security.  However, there are other factors that may be taken into account in determining whether a debt instrument is

a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued. Each holder is urged to consult its tax advisor regarding the status of its Claim and the New Notes as "securities" for federal income tax purposes.

### 1.    Recognition of Gain or Loss

If both the Claim and the New Note issued to the holder upon surrender of the Claim constitute "securities" for U.S. federal income tax purposes, a U.S. holder's receipt of the New Note in full or partial satisfaction of the Claim should constitute a "recapitalization" for U.S. federal income tax purposes. As a consequence, the U.S. holder of the Claim should not recognize loss on the exchange, but should recognize any gain realized on the exchange (computed in the manner described below), but only to the extent of any cash received in the exchange (excluding the portion attributable to accrued but unpaid interest). (See "Distributions in Discharge of Accrued Interest" below.) If the exchange is treated as a recapitalization, the U.S. holder's initial tax basis in the New Note should equal the holder's adjusted tax basis in the Claim, increased by any gain recognized in respect thereof, and reduced by any cash received in the exchange. The holding period for the New Note will include the holder's holding period for the Claim surrendered pursuant to the Plan.

If either a Claim or the New Note received in respect of the Claim does not constitute a "security" for U.S. federal income tax purposes, a U.S. holder of the Claim will generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the sum of the "issue price" of the New Note and amount of cash received (excluding the portion attributable to accrued but unpaid interest) and (2) the holder's adjusted tax basis in the Claim. For these purposes the issue price of a New Note will equal its stated principal amount. A U.S. holder's adjusted tax basis in a Claim will be equal to the cost of the Claim to such U.S. holder, reduced by the amount of any bad debt deduction taken by the U.S. holder with respect to the Claim, increased by any original issue discount previously included in income, and reduced by any cash payments received on the Claim other than payments of "qualified stated interest." If applicable, a U.S. holder's tax basis in a Claim will also be increased by any market discount previously included in income by such U.S. holder pursuant to an election to include market discount in income currently as it accrues and reduced by any amortizable bond premium which the U.S. holder has previously deducted. The rules regarding the computation of gain or loss from the receipt of a New Note and cash (if applicable) in discharge of a Claim are complex and highly detailed and holders of Claims consult their tax advisor regarding the computation of gain or loss.

In the case of a fully taxable exchange, a U.S. holder's tax basis in the New Note received will generally be equal to its issue price, and the holding period in the New Note should begin on the day following the Effective Date.

### 2.        Distributions in Discharge of Accrued Interest

In general, to the extent that money or property received by a holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such a holder will recognize a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim and thereafter, to accrued but unpaid interest, if any.  However, there is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

### 3.        Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, whether the Claim constitutes a capital asset in the hands of the holder, the holder's holding period for the Claim, whether the Claim was acquired at a market discount, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  A holder of a Claim who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 4.        Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of payment of their Claims under the Plan will be subject to limits on their use of capital losses.  For noncorporate Claim holders, capital losses may be used each year to offset any capital gains (without regard to holding periods) plus the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  For corporate Claim holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Holders of Claims who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Noncorporate holders of Claims may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income (see described immediately above) for an unlimited number of years.  Corporate Claim holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 5.       Treatment of the New Notes

*Stated Interest*.  Stated interest on a New Note, to the extent constituting "qualified stated interest," will be includible in the holder's income in accordance with such holder's regular method of accounting.  Whether stated interest on the New Notes will constitute "qualified stated interest" will depend on the final terms of the New Notes.  See "*Original Issue Discount*" below.

*Original Issue Discount*.  In general, when debt is issued with original issue discount ("OID"), the holder of the debt is required to include in gross income for each taxable year the OID accrued for each day during the taxable year on which it holds the debt.  The result is that the OID must be included in income before the cash representing that income is received by the holder.  The daily portions of OID that must be accrued are determined by calculating the OID for each accrual period during the year and then allocating to each day a proportionate portion of the OID that accrued during the accrual period.  The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the debt at the beginning of the accrual period, multiplied by the yield to maturity of the debt, reduced by the amount of any qualified stated interest allocable to such accrual period.  The "adjusted issue price" of a debt at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the debt in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the debt (other than payments of qualified stated interest).

A debt is treated as issued with OID if the excess of the "stated redemption price at maturity" of the debt over its issue price equals or exceeds a statutory de minimis threshold.  The "stated redemption price at maturity" of a New Note will equal the sum of its stated principal amount plus all other payments thereunder, other than payments of "qualified stated interest" (defined generally as stated interest that is unconditionally payable in cash or other property (other than debt instruments of the issuer) at least annually at a single fixed rate).  The "issue price" of each New Note is expected to be the stated principal amount of the New Note.

The terms of each of the Sun Promissory Note and the General Unsecured Promissory Note provide that the payment of interest on said New Note will not commence until the Sun and Unsecured Notes Payment Date.  Because these instruments do not require the payment of the stated interest in cash at least annually, such interest generally will not constitute qualified stated interest and will be included in stated redemption price, thereby producing OID.  As a result, each holder of such New Note will be required to report OID annually under the rules described above notwithstanding the deferral of payment of stated interest.

The HCREIT Promissory Note will provide for increases in the stated interest rate over the term of the instrument.  The amount of the increased interest that the holder of the HCREIT Promissory Note will ultimately receive will be affected by whether it receives a prepayment out of any Net AB 1383 Revenues.  This means not only that the instrument will fail to provide for stated interest at a single fixed rate (and therefore will have OID), but also that the increased interest is contingent and is likely to be governed by the Treasury Regulations applicable to contingent payment debt instruments.

In general, under such Treasury Regulations, the holder of the HCREIT Promissory Note will be required to accrue the OID in respect of the HCREIT Promissory Note under the noncontingent bond method, and include such amount in its gross income as interest over the term of the note based on the constant interest method and the yield to maturity of the note, as described below. Under this method, the yield to maturity of the HCREIT Promissory Note will be deemed to be the comparable yield at which the Reorganized Debtor would issue a comparable fixed rate debt instrument with terms and conditions similar to those of the HCREIT Promissory Note, including the level of subordination, term, timing of payments and general market conditions. No adjustment is made for the riskiness of the contingencies or the liquidity of the debt instrument. The comparable yield must be determined in good faith to be a reasonable yield for the Reorganized Debtor. The Reorganized Debtor will be required to determine a projected payment schedule based on the reasonably expected value of the contingent payments as of the issue date but adjusted to the extent necessary to produce the comparable yield, taking into account the issue price and the terms of the HCREIT Promissory Note.

The adjusted issue price of the HCREIT Promissory Note at the beginning of each accrual period will be multiplied by the HCREIT Promissory Note's comparable yield and the daily portions of the amount so determined (reduced by any qualified stated interest for the period) will constitute the OID to be included in the holder's income for the days in the period during which the HCREIT Promissory Note is held.

If, during any taxable year, the holder of the HCREIT Promissory Note receives payment of the increased interest in an amount that exceeds the total amount of projected payments for that taxable year, the holder will have additional interest income for the taxable year equal to such excess. If actual payments for the taxable year are in the aggregate less than the amount of projected payments for that taxable year, the holder will first reduce its interest income (i.e., its accrual of the OID and qualified stated interest) on the HCREIT Promissory Note for that taxable year and then, in the event such reduction would produce a "negative" amount for the year, such negative amount will be (i) currently deductible as an ordinary loss to the extent of any prior interest included in income with respect to the note (and not previously reversed by similar negative amounts in prior years), and (ii) otherwise carried forward and taken into account in determining the next year's adjustment.

If, upon sale, exchange or retirement of the HCREIT Promissory Note, after taking into account the determination of any interest accrual for such year, the above adjustment would produce a "negative" amount, such amount will reduce such holder's amount realized on such sale, exchange or retirement. In general, any gain realized upon the disposition of a HCREIT Promissory Note will be treated as interest income, while any loss will be treated as ordinary or capital depending upon the circumstances.

The determination and reporting of OID are highly complex. Holders of Allowed Claims are advised to consult with their own tax advisors regarding the possible application of the OID rules to the New Notes.

### 6.    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the Code's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### X.    CONCLUSION

The Debtor urges holders of Claims in the Voting Classes to vote to accept the Plan and to evidence such acceptance by returning their completed and signed Ballots so they will be received by the Debtor in accordance with the Voting Instructions no later than 4:00 p.m. (Pacific time) on December 8, 2010.

Dated: November 16, 2010

Respectfully submitted,

PACIFICA OF THE VALLEY CORPORATION

By:
Name:  Ayman Mousa
Title:   Chief Executive Officer

Submitted By:


Edward J. Green (IL Bar No. 6225069)
Geoffrey S. Goodman (IL Bar No. 6272297)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
(312) 832-4500

David Gould (CA Bar No. 39747)
David Gould, A Professional Corporation
23975 Park Sorrento, Suite 200
Calabasas, CA 91302-4001
(818) 222-8092